# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**MARGARET GIBBS WATKINS**

**CIVIL ACTION**

**VERSUS**

**NO. 19-635-JWD-WD**

**SID GAUTREAUX, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS EAST BATON ROUGE PARISH SHERIFF, ET AL.**

## RULING AND ORDER

This matter comes before the Court on the *Motion to Dismiss Second Amended Complaint* (Doc. 30) filed by defendant James Morgan Hammett ("Defendant" or "Hammett"). Plaintiff Margaret Gibbs Watkins ("Plaintiff" or "Mrs. Watkins") opposes the motion, (Doc. 33), and Hammett has filed a reply, (Doc. 34). Oral argument is not necessary. The Court has carefully considered the law, the well-pleaded facts alleged in the *Second Amended Complaint* (Doc. 21), and the arguments and submissions of the parties and is prepared to rule.

For the following reasons, Defendant's motion is granted in part and denied in part. Specifically, most of Plaintiff's § 1983 claims are dismissed as waived. Further, Plaintiff's § 1983 excessive force claim is dismissed because Plaintiff has failed to demonstrate that Hammett is not entitled to qualified immunity; that is, Plaintiff has failed to show that every reasonable officer in Hammett's position would know that his conduct was unlawful under clearly established law. However, Plaintiff has stated viable state law claims against Hammett, as Plaintiff has sufficiently alleged that Hammett's conduct was unreasonable under the totality of the circumstances.

# I.    Relevant Factual and Procedural Background

## A.  Introduction

The following factual allegations are largely taken from the *Second Amended Complaint* (Doc. 21).  The well-pleaded facts are assumed to be true and viewed in a light most favorable to Plaintiff. *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 502–03 (5th Cir. 2014).

Plaintiff in this action is Margaret Gibbs Watkins. (*Sec. Amend. Compl.*, Doc. 21 at 1.)  She was married to Melvin Watkins ("Decedent" or "Mr. Watkins") in 1995, and they were domiciled together in East Baton Rouge Parish. (*Id.* ¶ 3.)

There were originally two Defendants in this case: (1) Sid Gautreaux, Sheriff of East Baton Rouge Parish, and (2) James Morgan Hammett, individually and in his official capacity as a former deputy of the East Baton Rouge Sheriff's Office. (*Id.* ¶ 2.)  Gautreaux was previously dismissed from this case (Doc. 29), so Hammett is the only remaining Defendant.

## B.  Facts Giving Rise to the Suit

On September 14, 2019, Plaintiff and her family members were present at a birthday party for her 95-year-old aunt. (*Sec. Amend. Compl.* ¶ 4, Doc. 21.)  Around 3:45 p.m., Mr. Watkins arrived at the party but began to have a verbal disagreement with an attendee of the party. (*Id.*) The host asked Mr. Watkins to leave, but Mr. Watkins initially refused. (*Id.*) Thereafter, another party guest telephoned 911 asking for an officer to escort Mr. Watkins from the residence. (*Id.*)

After this, "Mr. Watkins voluntarily removed himself from the residence and headed toward his car parked at least two (2) houses down . . . facing toward the exit to the subdivision." (*Id.* ¶ 5.)  He got into his car, and Plaintiff followed him to his car. (*Id.*)

As Mr. Watkins was pulling away from the curb, Hammett arrived in his police car and talked briefly with a few of Plaintiff's family members who were standing in the driveway of the house. (*Sec. Amend. Compl.* ¶ 6, Doc. 21.)  Plaintiff alleges:

> At no time was Mr. Watkins threatening toward defendant Hammett, took no action toward defendant Hammett, and was completely unarmed.  In fact, Mr. Watkins was in his car with the windows rolled up, and was not engaging with anyone.  He was simply leaving as requested.

(*Id.* ¶ 7.)

According to the operative complaint, "less than nine (9) seconds after arriving at the residence and upon exiting his vehicle, [Hammett] fired two (2) shots through the front windshield of Mr. Watkins' car, striking him in the chest." (*Id.* ¶ 8.)  Because of the gun blasts, Mr. Watkins "lost control of his lower extremities, causing his foot to depress the accelerator of his car." (*Id.*)  Next:

> [Hammett] fired at least three (3) more shots into Mr. Watkins from the driver's side of the car.  Ultimately, Mr. Watkins' car careened out of control down the street, struck mailboxes, flipped over, and came to rest in the front yard of a residence after hitting a car in the driveway.

 (*Id.*)

The East Baton Rouge Coroner determined that Mr. Watkins' death was a homicide. (*Id.* ¶ 9.)  The cause of death was multiple gunshot wounds to the chest and upper extremities. (*Id.*)

Plaintiff claims that Hammett was the legal cause of her husband's death. (*Sec. Amend. Compl.* ¶ 10, Doc. 21.)  She further alleges that Hammett did not have "probable or reasonable cause" to employ deadly force toward her husband. (*Id.*)  Plaintiff further asserts:

> Petitioner shows that given the less than nine (9) second lapse between the time said defendant officer exited his vehicle and fired his first shots into the chest of Mr. Watkins demonstrates that the officer's actions were in wanton and reckless disregard for the rights

of Mr. Watkins. In fact, in addition to common sense, the undersigned has consulted with several law enforcement veterans and experts in Peace Officers Standards and Training ("POST") who have indicated that based upon all available public information (i.e. witness statements, video, media reports, etc.) there is at this time, this shooting was not objectively reasonable. Moreover, had defendant Hammett been properly trained and supervised, he would or should have known how to properly assess the situation and utilize force continuum standards.

(*Id.* ¶ 11.)

Plaintiff makes allegations against Gautreaux that reflect on Hammett's background and purported propensity toward violence. (*Id.* ¶¶ 15–16.)  Specifically, Hammett was at one point employed by the Louisiana Department of Public Safety and Corrections, and he "was [allegedly] allowed to resign from DPS in lieu of termination amid an internal affairs investigation into complaints of excessive force and control of temper." (*Id.* ¶ 15.)  Further, after Decedent's passing, "defendant Hammett resigned from the EBRSO amid an internal affairs investigation into a photograph taken and disseminated by a fellow deputy, depicting a tear drop tattoo on his face, which are common among gang members who have served time in prison and/or taken another's life." (*Id.* ¶ 16.)

Plaintiff claims violations of Decedent's Fourth, Fifth, Eighth, and Fourteenth Amendment rights. (*Sec. Amend. Compl.* ¶ 12, Doc. 21.)  Plaintiff also asserts that Hammett committed the tort of assault and battery. (*Id.* ¶ 18.)  Plaintiff states that she suffered mental anguish prior to her husband's death and pleads a variety of damages, including punitive damages and attorneys' fees. (*Id.* ¶¶ 19, 21–25.)

### C.  Procedural Background

On September 23, 2019, Plaintiff filed suit against Sheriff Gautreaux. (*See* Docs. 1–2.) Shortly thereafter, on September 25, 2019, Plaintiff filed a motion to substitute the complaint, (Doc. 3), which was granted two days later, (Doc. 4.)   The *Amended Complaint* described a "currently unidentified Deputy with EBR Sheriff's Department[.]" (*Amend. Compl.* ¶ 2, Doc. 1.)

On November 27, 2019, Sheriff Gautreaux filed a motion to dismiss. (Doc. 11.)  He also filed a motion to stay discovery. (Doc. 13.)

On December 16, 2019, Plaintiff filed a motion to amend the operative complaint. (Doc. 15.)  Plaintiff sought to name Hammett as a defendant, as he was previously unidentified. (*Id.* at 1–2.)  On the same day, Plaintiff filed an opposition to the motion to dismiss. (Doc. 16.)

On December 23, 2019, the Magistrate Judge conducted a telephone conference. (Doc. 19.) She granted the motion for leave to file the *Second Amended Complaint* and gave Defendant two weeks within which to file a motion to withdraw the motion to dismiss without prejudice to his right to refile in response to the *Second Amended Complaint*. (*Id.*)  Discovery was also stayed pending the resolution of the qualified immunity defense asserted by Sheriff Gautreaux. (*Id.*)  On the same day, the *Second Amended Complaint* was filed into the record. (Doc. 21.) A few days later, on December 27, 2019, Sheriff Gautreaux filed a motion to withdraw his original motion to dismiss. (Doc. 22.)

On January 6, 2020, Sheriff Gautreaux filed a second motion to dismiss the *Second Amended Complaint*. (Doc. 24.)  No response to this motion was filed.

On March 9, 2020, the Court entered a Local Rule 7(f) Ruling granting the motion as unopposed. (Doc. 29.)   The ruling gave Plaintiff an opportunity to file a response (with an

explanation for the failure to comply with the opposition deadline) within fourteen days. (*Id.* at 2.) No response was filed.

On April 9, 2020, Hammett filed the instant *Motion to Dismiss*. (Doc. 30.)  Plaintiff opposed it, (Doc. 33), and Hammett filed a reply, (Doc. 34.)

## II.    Rule 12(b)(6) Standard

"Federal pleading rules call for a 'short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. R. Civ. P. 8(a)(2); they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (citation omitted).

Interpreting Rule 8(a) of the Federal Rules of Civil Procedure, the Fifth Circuit has explained:

> The complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim. "Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]."

*Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 1965 (2007)).

Applying the above case law, the Western District of Louisiana has stated:

> Therefore, while the court is not to give the "assumption of truth" to conclusions, factual allegations remain so entitled. Once those factual allegations are identified, drawing on the court's judicial experience and common sense, the analysis is whether those facts, which need not be detailed or specific, allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009)]; *Twombly*, 55[0] U.S. at 556. This analysis is not substantively different from that set forth in *Lormand*, *supra*, nor

> does this jurisprudence foreclose the option that discovery must be
> undertaken in order to raise relevant information to support an
> element of the claim. The standard, under the specific language of
> Fed. R. Civ. P. 8(a)(2), remains that the defendant be given adequate
> notice of the claim and the grounds upon which it is based. The
> standard is met by the "reasonable inference" the court must make
> that, with or without discovery, the facts set forth a plausible claim
> for relief under a particular theory of law provided that there is a
> "reasonable expectation" that "discovery will reveal relevant
> evidence of each element of the claim." *Lormand*, 565 F.3d at 257;
> *Twombly*, 55[0] U.S. at 556.

*Diamond Servs. Corp. v. Oceanografia, S.A. De* C.V., No. 10-00177, 2011 WL 938785, at *3
(W.D. La. Feb. 9, 2011) (citation omitted).

In deciding a Rule 12(b)(6) motion, all well-pleaded facts are taken as true and viewed in
the light most favorable to the plaintiff. *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 502–03
(5th Cir. 2014). The task of the Court is not to decide if the plaintiff will eventually be successful,
but to determine if a "legally cognizable claim" has been asserted." *Id.* at 503.

### III.    Discussion of § 1983 Claim

#### A. Preliminary Note and Parties' Arguments

Defendant moves to dismiss all of Plaintiff's claims. Defendant spends time on Plaintiff's
Fifth, Eighth, and Fourteenth Amendment claims and the official capacity claim, but Plaintiff's
opposition focuses solely on the Fourth Amendment excessive force and state law claims. Thus,
these are the only claims at issue. *See JMCB, LLC v. Bd. of Commerce & Indus.*, 336 F. Supp. 3d
620, 634 (M.D. La. 2018) (deGravelles, J.) (finding that operative complaint could be dismissed
because plaintiff failed to respond to the substance of defendant's arguments); *Apollo Energy, LLC
v. Certain Underwriters at Lloyd's, London*, 387 F. Supp. 3d 663, 672 (M.D. La. 2019)
(deGravelles, J.) (finding that policy exclusion could apply because plaintiff failed to oppose
insurer's argument on the issue).

Both sides agree that officers can use deadly force to protect others or the officer from significant injury.  But Defendant asserts:

> In the context of a police officer's use of deadly force against the driver of motor vehicles, courts have little trouble recognizing that a motor vehicle can be used as a deadly or dangerous weapon, and an officer who reasonably believes that the motor vehicle is being used or is about to be used as a deadly weapon, does not violate the Fourth Amendment when using deadly force to try to stop the danger created by such a motor vehicle.

(Doc. 30-1 at 8–9 (citation omitted).)  According to Defendant, Plaintiff makes only conclusory allegations that Defendant lacked cause to use deadly force on Decedent.  Plaintiff failed to plead any facts (beyond conclusions) regarding Decedent's conduct or the facts surrounding his death.  Plaintiff also failed to overcome qualified immunity, so, even if there was a constitutional violation, her claims should be dismissed.

Plaintiff emphasizes, *inter alia*, that, at the time of the accident, Decedent was not engaging with anyone and was simply leaving as requested; that Defendant fired shots less than 9 seconds after arriving on the scene; that Decedent at no time provoked the officer; that law enforcement veterans and experts in Peace Officer Standards and Training who were consulted about the case indicated that, based on their information, the shooting was not objectively reasonable; and that Defendant did not properly assess the situation and utilize continuum standards.  Thus, Mr. Watkins' Fourth Amendment rights were violated.  As to qualified immunity, Plaintiff explains:

> The Supreme Court in *Tennessee v. Garner*, 105 S. Ct. 1694 (1985), announced the principle that the use of deadly force is permitted only to protect the life of the shooting officer or others: "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Garner* also requires a warning before deadly force is used "where feasible," a critical component of risk assessment and de-escalation. *Id*. at 11-12. The Supreme Court has also repeatedly stated that this rule can be

> sufficient in obvious cases without dependence on the fact patterns
> of other cases. *White v. Pauly*, 137 S. Ct. 548,552 (2017).

(Doc. 33 at 10.)  Similarly, here, "Hammett utilized deadly force on an unarmed suspect where the suspect posed no immediate threat to the shooting officer or others," and the officer gave no warning. (*Id*. at 10–11.)

Defendant replies that he is entitled to qualified immunity.  Defendant explains that Plaintiff provided only conclusory allegations:

> [Plaintiff] did not plead any facts regarding the decedent's own conduct or any other factors relating to the circumstances leading to and surrounding the alleged deadly force, except to generally deny that Mr. Watkins took any threatening action toward Deputy Hammett, apparently under the presumption that Hammett was not a suspect for arrest and not being detained for an investigation and the argument that driving a motor vehicle directly at someone is not threatening.

(Doc. 34 at 3.)  Thus, there is no Fourth Amendment violation, and, even if there were, Defendant would be entitled to qualified immunity.

## B. Applicable Law

### *1. Qualified Immunity Generally*

"Qualified immunity provides government officials performing discretionary functions with a shield against civil damages liability, so long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006) (citing *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). "In determining whether an official enjoys immunity, we ask (1) whether the plaintiff has demonstrated a violation of a clearly established federal constitutional or statutory right and (2) whether the official's actions violated that right to the extent that an objectively reasonable person would have known." *Id*. (citing *Hope v. Pelzer*, 536 U.S. 730 (2002)).  Courts are "permitted to exercise their sound

discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### 2. Whether There Was a Fourth Amendment Violation

"The Fourth Amendment guarantees the right to be free from 'unreasonable searches and seizures.' " *Davis v. Romer*, 600 F. App'x 926, 929 (5th Cir. 2015) (per curiam) (quoting U.S. Const. amend. IV). "Apprehension by the use of deadly force is a seizure." *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) (citing *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)).

"For the first step" in the qualified immunity analysis, " 'all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard.' " *Hudspeth v. City of Shreveport*, 270 F. App'x 332, 336 (5th Cir. 2008) (per curiam) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  "To prevail on a Fourth Amendment excessive-force claim, a plaintiff must establish: (1) an injury; (2) that the injury resulted directly from the use of excessive force; and (3) that the excessiveness of the force was unreasonable." *Carnaby*, 636 F.3d at 187 (citing *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007)).

Because Decedent's "death was an injury caused by the deadly force employed, [] the only issue is whether the use of that deadly force was unreasonable." *Id.* "To gauge the objective reasonableness of the force, '[the Court] must balance the amount of force used against the need for force.' " *Id.* at 187–88 (quoting *Ramirez v. Knoulton*, 542 F.3d 124, 129 (5th Cir. 2008) (internal quotation marks and citation omitted)).

> Because "[t]he test of reasonableness under the Fourth Amendment
> is not capable of precise definition or mechanical application," *Bell*

> *v. Wolfish*, 441 U.S. 520, 559, 99 S. Ct. 1861, 1884, 60 L.Ed.2d 447
> (1979), . . . its proper application requires careful attention to the
> facts and circumstances of each particular case, including the
> severity of the crime at issue, whether the suspect poses an
> immediate threat to the safety of the officers or others, and whether
> he is actively resisting arrest or attempting to evade arrest by flight.
> *See Tennessee v. Garner*, 471 U.S., at 8–9, 105 S. Ct., at 1699–1700
> (the question is "whether the totality of the circumstances justifie[s]
> a particular sort of . . . seizure").

*Graham*, 490 U.S. at 396; *see also Flores v. City of Palacios*, 381 F.3d 391, 399 (5th Cir. 2004)

("This balancing test 'requires careful attention to the facts and circumstances of each particular

case.' " (quoting *Graham*, 490 U.S. at 396)).

"That second factor is the most important: [The Court] must determine whether [Decedent]

'posed an immediate threat to the safety of the officers or others.' " *Malbrough v. Stelly*, 814 F.

App'x 798, 803 (5th Cir. 2020) (per curiam) (quoting *Graham*, 490 U.S. at 396). "The '[u]se of

deadly force is not unreasonable when an officer would have reason to believe the suspect poses a

threat of serious harm to the officer or others.' " *Carnaby*, 636 F.3d at 188 (quoting *Mace v. City

of Palestine*, 333 F.3d 621, 624 (5th Cir. 2003)). That is, "[t]he use of deadly force may be proper

regardless of an officer's negligence if, at the moment of the shooting, he was trying to prevent

serious injury or death." *Id.* (citations omitted).

"[T]he proper inquiry is an *objective* one." *Hudspeth*, 270 F. App'x at 337 (citing

*Devenpeck v. Alford,* 543 U.S. 146, 153 (2004). The " 'Fourth Amendment's concern with

'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the

subjective intent." *Id.* (quoting *Devenpeck*, 543 U.S. at 153 (emphasis in original)) (quoting *Wren

v. United States,* 517 U.S. 806, 814 (1996))). Phrased another way, "[t]he 'reasonableness inquiry

is objective: the question is whether the officers' actions are objectively reasonable in light of the

facts and circumstances confronting them, without regard to their underlying intent or motivation.'

11

" *Davis*, 600 F. App'x at 931 (quoting *Rockwell v. Brown*, 664 F.3d 985, 991 (5th Cir. 2011)).
Thus, the officer's "subjective intent is irrelevant to the reasonableness determination." *Id.*

Further, the Court's "inquiry into reasonableness is fact-specific and 'must be judged from
the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'
" *Carnaby*, 636 F.3d at 188 (quoting *Graham*, 490 U.S. at 396–97). The Court must review as "
'a reasonable officer on the scene,' and [] 'allow[ ] for the fact that police officers are often forced
to make split-second judgments—in circumstances that are tense, uncertain, and rapidly
evolving—about the amount of force that is necessary in a particular situation.' " *Flores*, 381 F.3d
at 399 (quoting *Graham*, 490 U.S. at 396–97). The Court "cannot allow the 'theoretical, sanitized
world of our imagination to replace the dangerous and complex world that policemen face every
day.' " *Malbrough*, 814 F. App'x at 806 (quoting *Stroik v. Ponseti*, 35 F.3d 155, 158 (5th Cir.
1994) (quoting *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992)))

Thus, for example, in *Malbrough*, the Fifth Circuit was faced with a situation involving the
shooting of an individual in a vehicle. The appellate court concisely summarized the facts as
follows:

> Anthony Campbell was in his GMC Yukon with two friends outside
> his home in Acadia Parish, Louisiana when Police arrived to execute
> a search warrant. Officers surrounded Campbell's vehicle, shouted
> commands for the occupants to exit, and pulled one of Campbell's
> friends out onto the ground. Campbell refused to exit, threw his
> Yukon in reverse, smashed into the police cruiser parked behind
> him—then switched gears and took a hard-left turn, attempting to
> flee while surrounded by officers. One officer [named Ware] was
> either bumped to the ground or fell. The officers fired. And
> Campbell was hit. Tragically, the bullet, which remains lodged in
> Campbell's brain, disabled him for life.

*Malbrough*, 814 F. App'x at 799.

The Fifth Circuit affirmed the district court's finding that there was "no constitutional violation, because Campbell posed an immediate threat to the officers and civilian bystanders." *Id.* at 799–800. The Fifth Circuit relied on *Hathaway v. Bazany*, 507 F.3d 312 (5th Cir. 2007):

> In *Hathaway*, an officer on foot fired his weapon at a car that accelerated toward him. The bullet struck and killed the driver. We emphasized two factors in determining that the officer's use of deadly force was reasonable: (1) the limited time the officer had to respond, and (2) the officer's proximity to the path of the vehicle. *Id.* at 322. We further highlighted "our circuit's general acknowledgment that police officers are often required to make instantaneous decisions that ought not be second-guessed merely because other options appear plausible in hindsight." *Id.* at 321.

*Id.* at 804–05. Thus, in *Malbrough*, the key question was "whether it would have *appeared* to a reasonable officer on the scene that Ware, other officers, or bystanders were in danger." *Id.* at 805. Plaintiff "need[ed] to show that Ware (as well as the other officers and bystanders) were far enough away from the Yukon and its path, as it moved forward, that no reasonable officer could have thought anyone was in danger." *Id.* The Fifth Circuit agreed with the district court that it was objectively reasonable to respond with force, even if Ware had not been struck by the vehicle, because "(1) Ware went to the ground near the Yukon; (2) it was announced that an officer was down; and (3) the firing did not take place until the officers saw Ware go to the ground near the fleeing vehicle." *Id.* Lastly, the appellate court rejected plaintiff's argument that, once the vehicle passed Ware and the other officers, they should have stopped firing. The Fifth Circuit explained:

> [A]s the district court noted, the Supreme Court rejected a similar argument in in *Plumhoff v. Rickard*, 572 U.S. 765, 134 S. Ct. 2012, 188 L. Ed. 2d 1056 (2014). There, a high-speed chase came to a stop after the suspect "spun out into a parking lot and collided with [an officer's] cruiser." *Id.* at 769, 134 S. Ct. 2012. The officers then stepped out of their cruisers and banged on the suspect's passenger window, attempting to get him to surrender. But the suspect again punched the gas. *Id.* at 770, 134 S. Ct. 2012. One of the officers fired three shots at the suspect's car. *Id.* The suspect sped away, and after

13

the officers were safely out of the pathway of the fleeing car, they fired an additional twelve shots. *Id.*

The Court held that the officers did not act unreasonably: "It stands to reason that, if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Id.* at 777, 134 S. Ct. 2012. And the Court found that the threat had not ended precisely because the suspect "never abandoned his attempt to flee." *Id.* The case would be different, the Court noted, "if [the officers] had initiated a second round of shots after the initial round had clearly incapacitated [the suspect] and had ended any threat of continued flight, or if [the suspect] had clearly given himself up." *Id.* The same is true here. The officers were not aware that Campbell was "clearly incapacitated" by a bullet, and Campbell never stopped his vehicle or gave himself up. The officers continued firing until Campbell's vehicle came to a stop, which was when the threat was over.

*Malbrough*, 814 F. App'x at 806. Thus, the district court's granting of summary judgment for the defendants was affirmed. *Id.* at 807.

### 3. Whether Every Reasonable Officer Under the Circumstances Would Know His Conduct Was Unlawful

As to the second prong, " '[q]ualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (alterations and internal quotation marks omitted)). " 'Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct.' " *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).

"Although '[the Supreme] Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.' " *Id.* (quoting *White*, 137 S. Ct. at 551 (internal quotation marks omitted)). " 'In other words, immunity protects all but the plainly incompetent or those who

14

knowingly violate the law.' " *Id.* (quoting *White*, 137 S. Ct. at 551 (internal quotation marks omitted)).

" 'Of course, general statements of the law are not inherently incapable of giving fair and clear warning to officers.' " *Kisela*, 138 S. Ct. at 1153 (quoting *White*, 137 S. Ct. at 552 (internal quotation marks omitted)).  Thus, for example, the Supreme Court has said that:

> (1) "the reasonableness of an officer's use of force depends, in part, on whether the officer was in danger at the precise moment that he used force" and (2) "if the suspect threatens the officer with a weapon[,] deadly force may be used if necessary to prevent escape, and if[,] where feasible, some warning has been given."

*White*, 137 S. Ct. at 551 (quoting reversed lower court opinion, which in turn quoted, *inter alia*, *Garner*, 471 U.S. at 7, and *Graham*, 490 U.S. 386).  "[B]ut 'in the light of pre-existing law the unlawfulness must be apparent, [(citation omitted][, and,] [f]or that reason, [the Supreme Court has] held that *Garner* and *Graham* do not by themselves create clearly established law outside 'an obvious case." *White*, 137 S. Ct. at 552 (quoting *Brosseau*, 543 U.S. at 199).

Thus, "[a]n officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.' " *Kisela*, 138 S. Ct. at 1153 (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014)).  Phrased another way, "[w]hen considering a defendant's entitlement to qualified immunity, [the Court] must ask whether the law so clearly and unambiguously prohibited his conduct that 'every reasonable official would understand that what he is doing violates [the law].' " *McLin v. Ard*, 866 F.3d 682, 695 (5th Cir. 2017) (citing *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  " 'To answer that question in the affirmative, we must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of

15

the right in question with a high degree of particularity.' " *Id.* at 696 (quoting *Morgan*, 659 F.3d at 371–72 (internal quotation marks omitted) (quoting *al-Kidd*, 563 U.S. at 742)). " 'Where no controlling authority specifically prohibits a defendant's conduct, and when the federal circuit courts are split on the issue, the law cannot be said to be clearly established.' " *Id.* (quoting *Morgan*, 659 F.3d at 372).

Thus, for example, in *Brosseau v. Haugen*, "Officer Rochelle Brosseau . . . shot Kenneth Haugen in the back as he attempted to flee from law enforcement authorities in his vehicle." *Brosseau*, 543 U.S. at 194. The day before the incident, someone named Tamburello reported to the officer that Haugen had stolen some tools, and the officer "later learned that there was a felony no-bail warrant out for Haugen's arrest on drug and other offenses." *Id.* at 195. On the day of the incident, the officer heard a report that Haugen and Tamburello were fighting in Haugen's mother's yard. *Id.* When the officer arrived, Haugen fled and hid in the neighborhood. *Id.* at 196. Two other officers and a K-9 arrived, and they all searched for Haugen for 30 to 45 minutes. *Id.* An officer had heard that a neighbor had seen a man in her backyard. *Id.* Brosseau ran in that direction. *Id.* Haugen appeared and ran into the driveway of the mother's house. *Id.* With Brosseau in hot pursuit, Haugen ran into a jeep in the driveway and locked the door. *Id.* Brosseau believed Haugen was running to retrieve a weapon. *Id.* Brosseau ordered him out of the vehicle and pointed a gun at him. *Id.* The Supreme Court explained:

> Brosseau arrived at the Jeep, pointed her gun at Haugen, and ordered him to get out of the vehicle. Haugen ignored her command and continued to look for the keys so he could get the Jeep started. Brosseau repeated her commands and hit the driver's side window several times with her handgun, which failed to deter Haugen. On the third or fourth try, the window shattered. Brosseau unsuccessfully attempted to grab the keys and struck Haugen on the head with the barrel and butt of her gun. Haugen, still undeterred, succeeded in starting the Jeep. As the Jeep started or shortly after it began to move, Brosseau jumped back and to the left. She fired one

16

shot through the rear driver's side window at a forward angle, hitting
Haugen in the back. She later explained that she shot Haugen
because she was " 'fearful for the other officers on foot who [she]
believed were in the immediate area, [and] for the occupied vehicles
in [Haugen's] path and for any other citizens who might be in the
area.' " 339 F.3d, at 865.

Despite being hit, Haugen, in his words, " 'st[ood] on the gas' ";
navigated the " 'small, tight space' " to avoid the other vehicles;
swerved across the neighbor's lawn; and continued down the street.
*Id.*, at 882. After about a half block, Haugen realized that he had
been shot and brought the Jeep to a halt.

*Id.* at 196–97.

The Supreme Court began its analysis:

Specifically with regard to deadly force, we explained in *Garner*
that it is unreasonable for an officer to "seize an unarmed,
nondangerous suspect by shooting him dead." 471 U.S., at 11, 105
S.Ct. 1694. But "[w]here the officer has probable cause to believe
that the suspect poses a threat of serious physical harm, either to the
officer or to others, it is not constitutionally unreasonable to prevent
escape by using deadly force." *Ibid.*

*Brosseau*, 543 U.S. at 197–98. The Court then turned to the qualified immunity question and

explained the standard it must apply:

It is important to emphasize that this inquiry "must be undertaken in
light of the specific context of the case, not as a broad general
proposition." *Id.,* at 201, 121 S. Ct. 2151. As we previously said in
this very context:

"[T]here is no doubt that *Graham v. Connor, supra,*
clearly establishes the general proposition that use of
force is contrary to the Fourth Amendment if it is
excessive under objective standards of
reasonableness. Yet that is not enough. Rather, we
emphasized in *Anderson* [v. *Creighton*] 'that the
right the official is alleged to have violated must have
been "clearly established" in a more particularized,
and hence more relevant, sense: The contours of the
right must be sufficiently clear that a reasonable
official would understand that what he is doing
violates that right.' 483 U.S. [635,] 640 [, 107 S. Ct.

17

3034, 97 L. Ed. 2d 523 (1987)]. The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.,* at 201–202, 107 S. Ct. 3034.

The Court of Appeals acknowledged this statement of law, but then proceeded to find fair warning in the general tests set out in *Graham* and *Garner.* 339 F.3d, at 873–874. In so doing, it was mistaken. *Graham* and *Garner,* following the lead of the Fourth Amendment's text, are cast at a high level of generality. See *Graham v. Connor, supra,* at 396, 109 S. Ct. 1865 (" '[T]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application' "). Of course, in an obvious case, these standards can "clearly establish" the answer, even without a body of relevant case law. See *Hope v. Pelzer,* 536 U.S. 730, 738, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002) (noting in a case where the Eighth Amendment violation was "obvious" that there need not be a materially similar case for the right to be clearly established). See also *Pace v. Capobianco,* 283 F.3d 1275, 1283 (C.A. 11 2002) (explaining in a Fourth Amendment case involving an officer shooting a fleeing suspect in a vehicle that, "when we look at decisions such as *Garner* and *Graham,* we see some tests to guide us in determining the law in many different kinds of circumstances; but we do not see the kind of clear law (clear answers) that would apply" to the situation at hand). The present case is far from the obvious one where *Graham* and *Garner* alone offer a basis for decision.

*Brosseau*, 543 U.S. at 198–99.

The High Court then focused on "cases relevant to the 'situation [Brosseau] confronted': whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight." *Id.* at 200.  The Supreme Court looked at the officer's authority and concluded, "In these cases, the courts found no Fourth Amendment violation when an officer shot a fleeing suspect who presented a risk to others." *Id.* (citations omitted).  The Supreme Court then concluded:

These three cases taken together undoubtedly show that this area is one in which the result depends very much on the facts of each case.

18

> None of them squarely governs the case here; they do suggest that Brosseau's actions fell in the " 'hazy border between excessive and acceptable force.' " *Saucier v. Katz, supra*, at 206, 121 S. Ct. 2151. The cases by no means "clearly establish" that Brosseau's conduct violated the Fourth Amendment.

*Id.* at 201.

Similarly, *Davis v. Romer* also involved the shooting of a driver by a police officer. 600 F. App'x at 927. The Fifth Circuit concisely summarized the facts as follows:

> Officer J. Romer ("Romer") was attempting to arrest Charal Thomas ("Thomas"), who was sitting in the driver's seat of his vehicle. Although there was a warrant for his arrest, Thomas refused to exit his vehicle and submit to a lawful arrest. Romer reached inside the driver's window, and Thomas suddenly began driving away. Romer then jumped on the vehicle's running board and ordered Thomas to stop the vehicle, but Thomas ignored the order and continued to drive toward the entrance to the freeway. After Thomas refused to stop the vehicle, Romer, who was still standing on the running board of the fleeing vehicle, fatally shot Thomas.

*Id.* Thomas' family claimed excessive force. *Id.* Romer moved for summary judgment and argued qualified immunity. *Id.* at 928. The district court granted the motion. *Id.*

The Fifth Circuit affirmed. *Id.* at 927. The appellate court explained:

> Under such chaotic, dangerous circumstances, Appellants have not shown that Romer's conduct was objectively unreasonable. As previously discussed, the definitive question is whether Romer had a reasonable belief that Thomas posed a risk of serious harm at the time Romer used deadly force. Appellants have conceded that Romer was on the running board of the fleeing vehicle when he fired the fatal shots. We therefore conclude that at the time of the shooting, Romer had reason to believe that there was a serious threat of physical harm to him.

*Id.* at 930. The Fifth Circuit also rejected appellants' argument that Thomas was unarmed at the time of the shooting:

> The Supreme Court has held that it is constitutionally unreasonable to use deadly force on an unarmed suspect by shooting him while he was fleeing on foot. *Tennessee v. Garner*, 471 U.S. 1, 105 S. Ct.

> 1694, 85 L. Ed. 2d 1 (1985). This is because the officer "could not
> reasonably have believed" that the suspect "posed any threat," and
> the officer "never attempted to justify his actions on any basis other
> than the need to prevent an escape," *Id*. at 21, 105 S. Ct. 1694. That
> case is inapposite. Here, the testimony and the diagram of the scene
> demonstrate that Romer was standing by the driver's door when
> Thomas suddenly drove to the left with Romer's arm inside the
> vehicle. Moreover, it is undisputed that Romer was standing on the
> running board of the vehicle as it was being driven on the service
> road and headed toward the freeway. Clearly, Thomas's actions put
> the officer in harm's way, and there was a very real danger that
> Romer would sustain serious injury or death. Thus, unlike in
> *Garner*, Thomas's actions were posing a threat to Romer at the time
> of the shooting.

*Davis*, 600 F. App'x at 931. The Fifth Circuit next rejected Appellants' contention that the force

was unjustified because Thomas's warrants were for outstanding misdemeanor traffic violations.

"[T]he important question is whether the suspect is 'dangerous or benign' and 'not whether the

suspect is suspected of committing a felony or a misdemeanor.' " *Id.* Additionally, the fact that

the officer fired 12 shots rather than a single round was irrelevant, as " 'if police officers are

justified in firing at a suspect in order to end a severe threat to public safety, the officers need not

stop shooting until the threat has ended.' " *Id.* (quoting *Plumhoff*, 134 S. Ct. at 2022). The appellate

court concluded that "[t]he district court properly granted summary judgment as to the Fourth

Amendment claim based on qualified immunity." *Id.*

### C. Analysis

Having carefully considered the matter, the Court will grant Defendant's motion to dismiss

Plaintiff's § 1983 excessive force claim. In short, Plaintiff has failed to show that Hammett is not

entitled to qualified immunity.

Plaintiff fails to identify a single case that is factually analogous to this one. She instead

relies on *White* and *Brosseau* and argues that their general principles can create clearly established

law in "an obvious case." *White*, 137 S. Ct. at 552 (quoting *Brosseau*, 543 U.S. at 199)).

The Court sees two problems with this position.  First, *White* language is more nuanced than Plaintiff indicates.  *White* actually states: "in the light of pre-existing law the unlawfulness must be apparent, [(citation omitted)[, and,] [f]or that reason, [the Supreme Court has] held that *Garner* and *Graham* do not by themselves create clearly established law outside 'an obvious case.'" *White*, 137 S. Ct. at 552 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)). Thus, while *White* and *Brosseau* allow for exceptions for obvious cases, the general rule remains that "[a]n officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.' " *Kisela*, 138 S. Ct. at 1153 (quoting *Plumhoff*, 134 S. Ct. at 2023).  And, as *Kisela* also said, "[a]lthough '[the Supreme] Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.' " *Kisela*, 138 S. Ct. at 1152 (quoting *White*, 137 S. Ct. at 551).

But, even putting this aside, the second and larger problem for Plaintiff is that "[t]he present case is far from the obvious one where *Graham* and *Garner* alone offer a basis for decision." *Brosseau*, 543 U.S. at 199.  Here, a police officer arrived on the scene in response to a 911 call; "briefly spoke with a few of [Plaintiff's] family members who were standing in the driveway of the residence"; and "less than nine (9) seconds after arriving at the residence," fired two shots through the driver's front windshield as the driver was pulling away from the curb and leaving the scene. (*Sec. Amend. Compl.* ¶¶ 4–7, Doc. 21.)

Plaintiff's allegations that Mr. Watkins was not "threatening toward [ ] Hammett," that he "took no action toward [ ] Hammett," that he was "completely unarmed," and that he was "not engaging with anyone" and "simply leaving as requested," are conclusory and not dispositive. (*Id.*

21

¶ 7.)  As the Fifth Circuit explained in *Malbrough*, the key question is "whether it would have *appeared* to a reasonable officer on the scene that . . . bystanders were in danger." *Malbrough*, 814 F. App'x at 805; *see also Brosseau*, 543 U.S. at 200 ("In these cases, the courts found no Fourth Amendment violation when an officer shot a fleeing suspect who presented a risk to others."); *see also Davis*, 600 F. App'x at 931 (rejecting argument that suspect was unarmed and explaining that an officer can be "in harm's way" by a suspect's driving, and there can be a "very real danger that [the officer] would sustain serious injury or death" that renders the use of lethal force reasonable).  Ultimately, Mrs. Watkins "need[ed] to show that . . . bystanders[] were far enough away from [Mr. Watkin's vehicle] and its path, as it moved forward, that no reasonable officer could have thought anyone was in danger." *Id.*  Plaintiff has not alleged this.

Additionally, the above case law demonstrates other reasons Hammett is entitled to qualified immunity.  For instance, after Hammett fired his initial two shots, Mr. Watkins "lost control of his lower extremities causing his foot to depress the accelerator of his car." (*Sec. Amend. Compl.* ¶ 8, Doc. 21.)  Hammett then fired three additional shots. (*Id.*)  As explained above, "if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Malbrough*, 814 F. App'x at 806 (quoting *Plumhoff*, 572 U.S. at 777); *see also Davis*, 600 F. App'x at 931 (same) (quoting *Plumhoff*).  Thus, if Hammett was justified in his first two shots, he was certainly justified in his second set of shots, as Hammett was justified in "firing until [Decedent's] vehicle came to a stop, which was when the threat was over." *Id.*

Moreover, Plaintiff highlights other alleged incidents of excessive force and the tear-drop tattoo gang symbol as indications of Hammett's propensity toward violence. (*Sec. Amend. Compl.* ¶ 15–16, Doc. 21.)  But "subjective intent is irrelevant to the reasonableness determination." *Davis*,

22

600 F. App'x at 931. "The reasonableness inquiry is objective: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* (cleaned up).  Plaintiff has not shown that every reasonable officer would find Hammett's conduct unreasonable.

It bears repeating: the question for the second part of the qualified immunity analysis is not whether Hammett acted unreasonably.  Rather, it was incumbent upon Plaintiff to point to controlling authority demonstrating that "the law so clearly and unambiguously prohibited [Hammett's] conduct that 'every reasonable official would understand that what he is doing violates [the law].' " *McLin*, 866 F.3d at 695.  "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Kisela*, 138 S. Ct. at 1152 (quoting *White*, 137 S. Ct. at 551).

Without more, Plaintiff has not met her burden.  As a result, Hammett is entitled to qualified immunity, and Plaintiff's § 1983 excessive force claim will be dismissed.

## IV.    Discussion of State Law Claim

### A.  Parties' Arguments

Defendant urges that Plaintiff's state law claims fail for the same reasons as the federal excessive force claim.  Conversely, Plaintiff maintains that she stated a claim for assault and battery under state law; Mr. Watkins did not pose a threat or danger to anyone; he was merely pulling away from the curve; there were no exigencies; he was unarmed; and he was not committing a crime.

### B.  Applicable Law

Louisiana Code of Criminal Procedure Article 220 provides, "A person shall submit peaceably to a lawful arrest. The person making a lawful arrest may use reasonable force to effect

the arrest and detention, and also to overcome any resistance or threatened resistance of the person being arrested or detained." "The use of force by law enforcement officers must be tested by the 'reasonable force' standard established by this article. The test precludes 'clearly inappropriate force.' " *Kyle v. City of New Orleans*, 353 So. 2d 969, 972 (La. 1977) (quoting La. Code Crim. Proc. art. 220, Official Revision Comment (b))

"The use of force when necessary to make an arrest is a legitimate police function." *Id.* "But if the officers use unreasonable or excessive force, they and their employer are liable for any injuries which result." *Id.* (citations omitted). "Whether the force used is reasonable depends upon the totality of the facts and circumstances in each case." *Id.* at 973. "A court must evaluate the officers' actions against those of ordinary, prudent, and reasonable men placed in the same position as the officers and with the same knowledge as the officers." *Id.* "The degree of force employed is a factual issue." *Id.* (citations omitted).

The Louisiana Supreme Court has explained further:

> Several factors to be considered in making this determination are the known character of the arrestee, the risks and dangers faced by the officers, the nature of the offense involved, the chance of the arrestee's escape if the particular means are not employed, the existence of alternative methods of arrest, the physical size, strength, and weaponry of the officers as compared to the arrestee, and the exigencies of the moment.

*Kyle*, 353 So. 2d at 973 (citations omitted).

### C. Analysis

Preliminarily, the parties are mistaken in assuming that the Court must reach the same result for the state law claims as it did for the federal excessive force claim. For § 1983 and qualified immunity, the issue is (in part) whether every reasonable officer under the circumstances would know that Hammett's conduct was unlawful under clearly established law. But, for the

24

state law claims, the key question is whether, under the totality of the circumstances, Hammett's conduct was unreasonable.

In short, the Court finds that it was. Though Hammett and others faced a degree of danger with Mr. Watkin's moving toward the officer in a vehicle, the nature of this offense appeared minor, and there were alternate, less lethal means the officer could have used to prevent Mr. Watkins' escape. As alleged, the exigencies of the moment did not warrant firing two shots after a mere nine seconds of being at the scene.

Again, the question is not whether Plaintiff will prevail at trial. Rather, the key issue is whether "[t]he [operative] complaint (1) on its face (2) [] contain[s] enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim." *Lormand*, 565 F.3d at 257. The Court finds that Plaintiff has satisfied this burden at this stage

In sum, the Court finds that Plaintiff has stated viable state law claims against Hammett. Consequently, Defendant's motion will be denied on this issue.

## V. Leave to Amend

Plaintiff notes "in the alternative, should the Court determine additional facts are necessary, plaintiff must be given an opportunity to amend." (Doc. 33 at 4.) While the Court takes some issue with Plaintiff's use of the word "must," the Court agrees that Plaintiff should be given leave to amend under the circumstances.

"[A] court ordinarily should not dismiss the complaint except after affording every opportunity to the plaintiff to state a claim upon which relief might be granted." *Byrd v. Bates*, 220 F.2d 480, 482 (5th Cir. 1955). The Fifth Circuit has further stated:

> In view of the consequences of dismissal on the complaint alone, and the pull to decide cases on the merits rather than on the

> sufficiency of pleadings, district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal.

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002).

One leading treatise has further explained:

> As the numerous case[s] . . . make clear, dismissal under Rule 12(b)(6) generally is not immediately final or on the merits because the district court normally will give the plaintiff leave to file an amended complaint to see if the shortcomings of the original document can be corrected. The federal rule policy of deciding cases on the basis of the substantive rights involved rather than on technicalities requires that the plaintiff be given every opportunity to cure a formal defect in the pleading. This is true even when the district judge doubts that the plaintiff will be able to overcome the shortcomings in the initial pleading. Thus, the cases make it clear that leave to amend the complaint should be refused only if it appears to a certainty that the plaintiff cannot state a claim. A district court's refusal to allow leave to amend is reviewed for abuse of discretion by the court of appeals. A wise judicial practice (and one that is commonly followed) would be to allow at least one amendment regardless of how unpromising the initial pleading appears because except in unusual circumstances it is unlikely that the district court will be able to determine conclusively on the face of a defective pleading whether the plaintiff actually can state a claim for relief.

5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2016).

Here, though Plaintiff has amended her complaint twice, she has not done so in response to a ruling by this Court assessing the sufficiency of her claims.   Thus, "though [there is] a compelling case for denying leave to amend, the Court will act in accordance with the 'wise judicial practice' and general rule and grant Plaintiff's request." *JMCB*, 336 F. Supp. 3d at 641–42; *see also Fetty v. Louisiana State Bd. of Private Sec. Examiners*, --- F. Supp. 3d ----, No. 18-517, 2020 WL 520026, at *15 (M.D. La. Jan. 31, 2020) (deGravelles, J.) ("because Plaintiffs did not amend their complaint in response to a ruling by this Court, and because of the above 'wise

judicial practice,' the Court will grant Plaintiffs one final opportunity to amend their complaint to state viable claims against the Board Members." (citing *JMCB*, 336 F. Supp. 3d at 641–42)); *Murphy v. Bos. Sci. Corp.*, No. 18-31, 2018 WL 6046178, at *1 (M.D. La. Nov. 19, 2018) (deGravelles, J.) (reaching same result) (citing, *inter alia*, *JMCB*).

Failure to cure the deficiencies will likely result in the dismissal of Plaintiff's case from this Court.  Specifically, if Plaintiff fails to cure the deficiencies in her § 1983 claims, they will be dismissed with prejudice.  Further, if all of Plaintiff's § 1983 claims are dismissed, the Court will, in all likelihood, decline to exercise supplemental jurisdiction over Plaintiff's state law claims. *See Enochs v. Lampasas Cty.*, 641 F.3d 155, 159–61 (5th Cir. 2011) ("Our general rule is to dismiss state claims when the federal claims to which they are pendent are dismissed." (collecting cases)); *Pullins v. Hancock Whitney Bank*, No. CV 19-00006, 2021 WL 96246, at *12 (M.D. La. Jan. 11, 2021) (Dick, C.J.) (declining to exercise supplemental jurisdiction over state law IIED claim after federal claims were dismissed).

## VI.    Conclusion

Accordingly,

**IT IS ORDERED** that the *Motion to Dismiss Second Amended Complaint* (Doc. 30) filed by defendant James Morgan Hammett is **GRANTED IN PART** and **DENIED IN PART.**

27

**IT IS FURTHER ORDERED** that the motion is **GRANTED** in that Plaintiff's § 1983 claims against Hammett are **DISMISSED WITHOUT PREJUDICE.** Plaintiff is given twenty-eight (28) days in which to amend her operative complaint to cure the above deficiencies. Failure to do so will result in the dismissal of her § 1983 claims with prejudice and, in all likelihood, the Court declining to exercise supplemental jurisdiction over Plaintiff's state law claims.

**IT IS FURTHER ORDERED** that, in all other respects, Defendant's motion is **DENIED**. Specifically, Plaintiff has stated viable state law claims against Hammett.

Signed in Baton Rouge, Louisiana, on <u>January 28, 2021</u>.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**